UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JAMES C. PATTERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:16-cv-00558-JMS-DML |
| | ) | |
| NANCY A. BERRYHILL, Acting Commissioner of the Social Security Administration, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

## Report and Recommendation
## on Complaint for Judicial Review

This matter was referred to the Magistrate Judge under 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b) for a report and recommendation as to its appropriate disposition. As addressed below, the Magistrate Judge recommends that the District Judge REVERSE AND REMAND the decision of the Commissioner of the Social Security Administration that plaintiff James C. Patterson is not disabled.

## Introduction

Mr. Patterson applied on August 24, 2012, for Disability Insurance Benefits (DIB) under Title II of the Social Security Act and Supplemental Security Income (SSI) under Title XVI of the Social Security Act, alleging that he has been disabled since April 15, 2011. Acting for the Commissioner of the Social Security Administration following a hearing on September 25, 2014, an administrative law

judge ("ALJ") found that Mr. Patterson is not disabled. The Appeals Council denied review of the ALJ's decision on January 19, 2016, rendering the ALJ's decision for the Commissioner final. Mr. Patterson timely filed this civil action under 42 U.S.C. § 405(g) for review of the Commissioner's decision.

The court will first describe the legal framework for analyzing disability claims and the court's standard of review, and then address Mr. Patterson's specific assertions of error.

## Standard for Proving Disability

To prove disability, a claimant must show he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). Mr. Patterson is disabled if his impairments are of such severity that he is not able to perform the work he previously engaged in and, if based on his age, education, and work experience, he cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A). The Social Security Administration (SSA) has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 404.1520.[1]

---

[1] Two programs of disability benefits are available under the Social Security Act: DIB under Title II for persons who have achieved insured status through employment and withheld premiums, 42 U.S.C. § 423 *et seq.*, and SSI disability benefits under Title XVI for uninsured individuals who meet income and resources criteria, 42 U.S.C. § 1381 *et seq.* The court's citations to the Social Security Act and

Step one asks if the claimant is currently engaged in substantial gainful activity; if he is, then he is not disabled. Step two asks whether the claimant's impairments, singly or in combination, are severe; if they are not, then he is not disabled. A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The third step is an analysis of whether the claimant's impairments, either singly or in combination, meet or medically equal the criteria of any of the conditions in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. The Listing of Impairments includes medical conditions defined by criteria that the SSA has pre-determined are disabling, so that if a claimant meets all of the criteria for a listed impairment or presents medical findings equal in severity to the criteria for the most similar listed impairment, then the claimant is presumptively disabled and qualifies for benefits. *Sims v. Barnhart,* 309 F.3d 424, 428 (7th Cir. 2002).

If the claimant's impairments do not satisfy a listing, then his residual functional capacity (RFC) is determined for purposes of steps four and five. RFC is a claimant's ability to do work on a regular and continuing basis despite his impairment-related physical and mental limitations. 20 C.F.R. § 404.1545. At the fourth step, if the claimant has the RFC to perform his past relevant work, then he is not disabled. The fifth step asks whether there is work in the relevant economy

---

regulations promulgated by the Social Security Administration are those applicable to DIB benefits. For SSI benefits, materially identical provisions appear in Title XVI and at 20 C.F.R. § 416.901 *et seq.*

3

that the claimant can perform, based on his age, work experience, and education (which are not considered at step four), and his RFC; if so, then he is not disabled.

The individual claiming disability bears the burden of proof at steps one through four. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987). If the claimant meets that burden, then the Commissioner has the burden at step five to show that work exists in significant numbers in the national economy that the claimant can perform, given his age, education, work experience, and functional capacity. 20 C.F.R. § 404.1560(c)(2); *Young v. Barnhart,* 362 F.3d 995, 1000 (7th Cir. 2004).

## **Standard for Review of the ALJ's Decision**

Judicial review of the Commissioner's (or ALJ's) factual findings is deferential. A court must affirm if no error of law occurred and if the findings are supported by substantial evidence. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). Substantial evidence means evidence that a reasonable person would accept as adequate to support a conclusion. *Id.* The standard demands more than a scintilla of evidentiary support, but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001).

The ALJ is required to articulate a minimal, but legitimate, justification for his decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in his decision, but he cannot ignore a line of evidence that undermines the conclusions he made, and he must trace the path of his reasoning and connect the evidence to his findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000).

## Administrative Proceedings

Mr. Patterson was born in 1979 and was 35 years old at the time of the administrative hearing in September 2014. At the hearing, Mr. Patterson and a vocational expert testified.

At step one, the ALJ determined that Mr. Patterson had not engaged in substantial gainful activity since April 15, 2011, the alleged onset date. At step two, the ALJ found Mr. Patterson had the following severe impairments: morbid obesity, chest pain, back pain, diabetes, hypertension, and obstructive sleep apnea (OSA). At step three, the ALJ concluded that Mr. Patterson did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments.

Considering his impairments, the ALJ determined Mr. Patterson has the RFC to perform sedentary work, as defined in the regulations, with certain additional restrictions. Specifically, he cannot climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs. Also, he cannot crawl, but can occasionally balance, stoop, crouch, and kneel. (R. 22).

With this RFC and based on the ALJ's review of testimony of a vocational expert (VE), the ALJ found at step four that Mr. Patterson was unable to perform any past relevant work. The ALJ found that Mr. Patterson had past relevant work as a cashier, but the VE testified that that job exceeds the parameters of the RFC set forth above. The ALJ found at step five, however, that jobs exist in significant numbers in the national economy that Mr. Patterson could perform, including circuit board assembler, surveillance system monitor, and information clerk.

Therefore, the ALJ determined Mr. Patterson has not been under a disability from April 15, 2011, through the date of the ALJ's decision. Mr. Patterson now challenges this outcome.

## Analysis

Mr. Patterson maintains the ALJ made three overarching errors: (1) the ALJ failed to account properly for the impact Mr. Patterson's severe obesity has on the rest of his functioning and failed to provide any comprehensible listing discussion; (2) the ALJ made a "critical error" in failing to discuss Mr. Patterson's alleged need for oxygen to perform any sort of exertional activities; and (3) the ALJ failed to articulate his application of SSR 96-7p in assessing Mr. Patterson's symptoms. The court considers each argument below.

**I.     There is no error in the ALJ's step three determination.**

Regarding the ALJ's step three determination, Mr. Patterson asserts that the ALJ's "listing discussion is inadequate, indeed there is no analysis at all." (Br. at 21). Mr. Patterson also specifically faults the ALJ's listing analysis for not mentioning: (1) SSR 02-1p; (2) the impact Mr. Patterson's obesity has on his other impairments; and (3) any respiratory listings.

It is the claimant's burden to prove that his condition meets or equals a listed impairment. *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). Although the ALJ "bear[s] some responsibility for developing the administrative record . . . [the ALJ is] also free to assume that a claimant represented by counsel has presented his strongest case for benefits . . . ." *Buckhanon*, 368 F. Appx. at 679 (internal citations omitted).

6

In his listing discussion, the ALJ determined:

> The evidentiary standards are stricter for presumptive disability under the listings because this represents an automatic screening based on medical findings alone rather than on all relevant factors to the claim . . . As such, when a claimant alleges that a listing section is met or equaled, the claimant must present specific medical findings that satisfy all of the criteria of a particular listing . . . In this matter, the claimant has failed to present such evidence. Nonetheless, the undersigned has considered the record as a whole and found that no treating physician has indicated findings that would satisfy the severity requirements of any listed impairment. The undersigned also considered the opinions of the State Agency medical consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion . . . In reaching this finding, the undersigned considered all of the listed impairments, but particularly Listing 1.04.

(R. 21) (internal citations omitted).

Contrary to Mr. Patterson's assertion, the ALJ properly analyzed whether Mr. Patterson met or equaled a listing. Mr. Patterson does not dispute the findings of the State Agency consultants that no listing was met or equaled. Mr. Patterson does not point to any medical opinion (nor could he) that the ALJ ignored establishing that he met or equaled a listing. Rather, at bottom, Mr. Patterson seeks remand on this ground because the ALJ did not specifically mention any respiratory listings or Mr. Patterson's obesity in this portion of the opinion. However, the ALJ discusses Mr. Patterson's obesity – and its impact on his other impairments – at length throughout his opinion. (R. 22-24). Therefore, the court cannot say that the ALJ's failure to explicitly mention any respiratory listings

constituted error. And even if it did, that error was harmless because Mr. Patterson has not pointed to any evidence establishing that he met a listing.

II.     **The ALJ's RFC determination is not supported by substantial evidence.**

As discussed above, the ALJ limited Mr. Patterson to sedentary work, as defined in the regulations, with some additional limitations. (*Id.* at 21). Although the Commissioner tries to minimize its significance (Br. at 11), work at the sedentary level requires an individual to stand and/or walk up to two hours out of an eight hour work day. SSR 96-9p. Despite that fact, the ALJ failed to analyze properly Mr. Patterson's daytime oxygen usage in his RFC determination. (R. 21-25). That failure, especially in light of the vocational expert's testimony at the hearing, also affects the ALJ's determination at step five. Therefore, remand is required.

Mr. Patterson testified that he was using oxygen all day for three months in 2011, after which he used oxygen only at night until he could get a CPAP machine. Once he got a CPAP machine, he needed to use oxygen only with exertion. (R. 35-36). Mr. Patterson stated that following his hospitalization for pneumonia in 2011, any time he walked or exerted himself he would become short of breath and experience chest pain, symptoms which continued to the time of the hearing. (*Id.* at 36-37). In 2012, Mr. Patterson was diagnosed with obesity hypoventilation syndrome (*Id.* at 22, 399-400), a breathing disorder affecting some obese people that leads to too much carbon dioxide and low oxygen in the blood (American Thoracic Society, Patient Information Series, Obesity Hypoventilation Syndrome, *available*

8

*at*: https://www.thoracic.org/patients/patient-resources/resources/obesity-hypoventilation-syndrome.pdf). Although the Commissioner notes that Mr. Patterson was not using oxygen at the hearing, the evidence was that about a month before the hearing, his oxygen tank was taken away from him because of insurance reasons. (R. at 36).

In addition to Mr. Patterson's testimony, the record is replete with references to Mr. Patterson's daytime oxygen usage. (*See, e.g., id.* at 217, 400-01, 435, 442, 502, 524, 526). In October 2013, after Mr. Patterson reported that he used three liters of supplemental oxygen intermittently with activities when short of breath, a home oxygen evaluation was performed. (*Id.* at 442). The recommendation from that evaluation was that Mr. Patterson use supplemental oxygen with activities. (*Id.*) Consistent with that, the consultative examination report dated April 19, 2013, reflects that Mr. Patterson "uses 3 L of home oxygen at all times." (*Id.* at 435).

Despite this evidence, the following two sentences constitute the totality of the ALJ's discussion of Mr. Patterson's daytime oxygen use in the RFC analysis (and the opinion as a whole): "He has to use oxygen every night, and occasionally during the day if he exerts himself secondary to obesity hypoventilation. He has to use it after showering, heavy cleaning, unloading groceries, or significant walking. (4E; 9F/12; 14F/3, 28)." (*Id.* at 23).

One of the medical records cited by the ALJ in support of his findings regarding Mr. Patterson's daytime oxygen use (14F at p. 3 (R. 492)), describing a

9

July 2014 doctor's appointment, clearly states that Mr. Patterson was using oxygen when he was "up walking around." That the ALJ cited a medical record that may undermine his determination regarding Mr. Patterson's abilities and need for oxygen is problematic in and of itself. Though he cited that record, the ALJ's determination instead appears to have borrowed heavily from Exhibit 4E, the agency's November 20, 2012, report of contact regarding Mr. Patterson's ADLs. (R. 200). That report describes what *may* be characterized as less frequent use of oxygen.[2]

While the evidence regarding Mr. Patterson's oxygen use throughout the day is not completely consistent, the court cannot tell from the ALJ's two sentences whether he considered and rejected the contrary or conflicting medical evidence – let alone his reasons for doing so – or ignored it all together (citation to exhibit 14F notwithstanding). Furthermore, the ALJ is required to *reconcile* conflicting evidence. That clearly did not happen here. There is no logical bridge for the court to follow in order to trace the ALJ's reasoning, and therefore the court must remand.

---

[2] "When asked to explain what type of activities lead to his having to use oxygen, he stated, 'anything that requires a lot of moving around'. Further clarification was obtained when he reported that after showering he will use oxygen for 15-20 min. This is the only time he finds he always has to use it. There are also times when he does heavy cleaning, a large amount of dishes, or significant walking where he finds he needs to sit and take o2 for a few minutes at a time . . . However, when unloading groceries to the home he generally does need to sit for a few min with o2 afterwards." (R. 200).

10

The court notes that, upon examination by Mr. Patterson's attorney, the VE testified that use of oxygen tank at a sedentary level may be an accommodation by the employer and it would be a workplace hazard. (R. 49). As Mr. Patterson points out, if he must have oxygen with him for the times he is required to stand and/or walk, that may be considered a workplace hazard that cannot be reasonably accommodated. (Br. at 26). The Commissioner argues that "the VE did not testify that requiring access to an oxygen tank precluded work, only that such access would merely warrant a workplace accommodation (Tr. 49)." (Br. at 12). She maintains that "[p]laintiff declined to ask more questions, and now instead attempts to twist the VE testimony to reflect a lack of significant jobs (Brf. at 25)." (*Id.*)

But because the ALJ did not analyze Mr. Patterson's oxygen use in his RFC analysis, there was no consideration of the potential impact of Mr. Patterson's oxygen use and of the VE's testimony regarding the presence of an oxygen tank on the availability of jobs in the national economy at all. On remand, should the ALJ determine that Mr. Patterson must have oxygen with him for the times he is required to stand and/or walk, the ALJ must consider the impact of that oxygen usage at step five.

### III. <u>The court makes no determination regarding the ALJ's credibility assessment.</u>

Mr. Patterson argues that the ALJ "failed to articulate his application of SSR 96-7p in assessing Mr. Patterson's symptoms." (Br. at 12). Mr. Patterson maintains that the ALJ "fails to provide any actual explanation as to the finding that Mr. Patterson is 'not entirely credible.'" (*Id.*) However, that argument is

undercut by Mr. Patterson's subsequent attacks on the ALJ's determinations regarding what the ALJ found to be inconsistent statements and non-compliance with medical treatment by Mr. Patterson (*Id.* at 14-15).

The court also notes that in addition to the acknowledged credibility "boilerplate," the ALJ specifically identified several reasons for his partially negative credibility assessment: Mr. Patterson's activities of daily living showed he was more functional than he acknowledged at the hearing; Mr. Patterson made inconsistent statements regarding his sleep and his marijuana use; Mr. Patterson's daily marijuana usage; and Mr. Patterson's non-compliance with medical treatment and advice. (R. 24-25).

Two of the grounds listed by the ALJ are problematic. First, the ALJ determined Mr. Patterson had made inconsistent statements regarding his sleep disorder without acknowledging or discussing the almost three-year gap between those statements. (*Id.*) Second, the ALJ concluded Mr. Patterson had been non-compliant with medical advice or treatment, in part because he "admitted to drinking a gallon of kool-aid with added sugar daily for ten months despite being diabetic" and that he "refused to undergo a myocardial perfusion rest/stress study." (*Id.* at 25). However, the medical records cited by the ALJ to support these determinations contradict the ALJ's conclusions. It was at the appointment where Mr. Patterson was diagnosed with "new onset diabetes secondary to worsening insulin resistance from poor diet and obesity" that Mr. Patterson stated that he *had been* drinking one gallon of Kool-aid with added sugar for the past ten months. (*Id.*

12

at 441-42). And in fact, Mr. Patterson stopped the myocardial perfusion rest/stress study because he "experienced significant discomfort when attempting to lay still on the scanner table for [two] minutes." (*Id.* at 445). For the reasons discussed above, the absence of any discussion of Mr. Patterson's testimony and other evidence regarding his daytime oxygen usage as part of the credibility analysis is error and must be addressed on remand. These two matters also may be addressed on remand.

## Conclusion

For the foregoing reasons, the Magistrate Judge recommends that the District Judge REVERSE AND REMAND the Commissioner's decision under sentence four of 42 U.S.C. § 405(g).

Any objections to this Report and Recommendation must be filed in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). The failure to file objections within fourteen days after service will constitute a waiver of subsequent review absent a showing of good cause for that failure. Counsel should not anticipate any extension of this deadline or any other related briefing deadlines.

IT IS SO RECOMMENDED.

Dated: June 15, 2017

Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana